# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| DALE BARTON, ROBERT FLOS, and GIOVANNI VECCHIATO, Derivatively on Behalf of REVOLUTION LIGHTING TECHNOLOGIES, INC., | ) ) ) ) ) ) Case No.: _____ ) |
| Plaintiffs, | ) |
| v. | ) **VERIFIED STOCKHOLDER** ) **DERIVATIVE COMPLAINT FOR** ) **BREACH OF FIDUCIARY DUTY** |
| ROBERT V. LAPENTA, CHARLES J. SCHAFER, JAMES A. DEPALMA, WILLIAM D. INGRAM, STEPHEN G. VIRTUE, and DENNIS MCCARTHY, | ) ) **JURY TRIAL DEMANDED** ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| REVOLUTION LIGHTING TECHNOLOGIES, INC., a Delaware Corporation, | ) ) ) ) |
| Nominal Defendant. | ) ) ) |

Plaintiffs Dale Barton, Robert Flos, and Giovanni Vecchiato ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Revolution Lighting Technologies, Inc. ("Revolution Lighting" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review of pleadings filed in the Securities Class Actions (as defined below); (c) review and analysis of press releases and media reports

issued by and disseminated by Revolution Lighting; and (d) review of other publicly-available information concerning Revolution Lighting.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty brought on behalf of nominal defendant Revolution Lighting against certain current and former officers and members of the Company's Board of Directors (the "Board").

2.      Revolution Lighting purports to design and manufacture light-emitting diode ("LED") lighting solutions for industrial, commercial, and government markets.

3.      On October 17, 2018, Revolution Lighting filed a Form 8-K with the SEC reporting its preliminary financial results for the third quarter of 2018, with revenue expected to be $33 million, compared to guidance of $40-$41 million.

4.      Revolution Lighting also announced in the Form 8-K that Defendant Robert V. LaPenta ("LaPenta"), its Chief Executive Officer ("CEO"), President, and Chairman of the Board had offered to acquire all of the Company's common stock for $2.00 per share, more $0.50 a share less than the Company's stock was trading on October 16, 2018.

5.      On this news, Revolution Lighting's stock price fell $0.98 per share, or over 38%, to close at $1.58 per share on October 17, 2018, on unusually heavy trading volume.[1]

6.      On October 19, 2018, Revolution Lighting issued a press release disclosing "an ongoing investigation by the SEC regarding certain revenue recognition practices, including bill and hold transactions that occurred between 2014 through the second quarter of 2018."

7.      On this news, Revolution Lighting's stock price fell $0.16 per share, or over 10%, to close at $1.43 per share on October 22, 2018, on unusually heavy trading volume.

---

[1]  The Company's stock traded on a split adjusted basis following a one for-ten reverse stock split, effective March 11, 2016.  All references to the stock price herein reflect the post-spilt price.

8.     Then, on November 14, 2018, Revolution Lighting announced that its Transaction Committee (as described below) was considering an updated proposal from LaPenta to acquire all of the Company's outstanding stock for $1.50 per share, referring to the SEC investigation as part of the reason LaPenta wished to take Revolution Lighting private.

9.     On this news, Revolution Lighting's stock price fell $0.55 per share, or nearly 40%, to close at $0.85 per share on November 15, 2018, on unusually heavy trading volume.

10.     Between March 14, 2014 and November 14, 2018 (the "Relevant Period"), the Individual Defendants (as defined herein) made false and/or misleading statements and failed to disclose material adverse facts about Revolution Lighting's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that:    (i) Revolution Lighting was improperly recognizing revenue for certain transactions; (ii) as a result, Revolution Lighting's financial statements were misstated; (iii) Revolution Lighting lacked adequate internal controls over financial reporting; (iv) as a result, Revolution Lighting would be subject to regulatory scrutiny and incur substantial costs; and (v) as a result of the foregoing, the Individual Defendants' positive statements about Revolution Lighting's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

11.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the wrongdoing as alleged herein.

12.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Revolution Lighting has sustained damages as described below.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14. This Court has personal jurisdiction over the defendants because either they live in the State of Connecticut or they committed or omitted acts in the State of Connecticut for which they are being sued in this action.

15. Venue is proper in this Court under 28 U.S.C. § 1931(b) because a substantial portion of the transactions and wrongs complained of in this action occurred in this District and because defendants conducted business here and engaged in activities that had an effect in this District.

## PARTIES

16. Plaintiff Dale Barton is a current stockholder of 100 shares of Revolution Lighting and has held Revolution Lighting common stock continuously since March 14, 2014. Plaintiff will fairly and adequately represent the interests of Revolution Lighting's stockholders in enforcing the rights of the Company. Plaintiff is a citizen of Michigan.

17. Plaintiff Robert Flos is a current stockholder of 35,000 shares of Revolution Lighting and has held Revolution Lighting common stock continuously since July 2, 2014. Plaintiff will fairly and adequately represent the interests of Revolution Lighting's stockholders in enforcing the rights of the Company. Plaintiff is a citizen of Colorado.

18. Plaintiff Giovanni Vecchiato is a current stockholder of 1,100 shares of Revolution Lighting and has held Revolution Lighting common stock continuously since March 11, 2016. Plaintiff will fairly and adequately represent the interests of Revolution Lighting's stockholders in enforcing the rights of the Company. Plaintiff is a citizen of Italy.

19.     Defendant Revolution Lighting is incorporated under the laws of Delaware with its principal executive offices located in Stamford, Connecticut.  Revolution Lighting's common stock trades on the Nasdaq Stock Market ("NASDAQ") under the symbol "RVLT."

20.     Defendant LaPenta has been a member of the Board and its Chairman since September 2012, CEO since January 2013, and President since July 2015.  LaPenta also holds a substantial personal investment of Revolution Lighting's common stock through RVL 1 LLC ("RVL").  RVL is controlled by its managing member, Aston Capital, LLC ("Aston"), of which LaPenta is CEO and a member.  As of Revolution Lighting's March 22, 2018 proxy statement (the "2018 Proxy"), RVL directly holds 8,245,386 shares, or 36.88%, of Revolution Lighting's outstanding common stock.  Aston, in its capacity as the managing member of RVL, is the beneficial owner of 8,575,386 shares, or 38.35%, of Revolution Lighting's outstanding common stock.  This number includes an additional 330,000 shares of restricted common stock that Aston holds directly.  LaPenta also owns 950,000 shares of Revolution Lighting common stock in his personal account.  His total beneficial ownership amounts to 9,525,386 shares, or 42.60%, of Revolution Lighting's outstanding common stock.  He is named as a defendant in the Securities Class Actions.  LaPenta is a citizen of Connecticut.

21.     Defendant Charles J. Schafer ("Schafer") was the Company's Chief Financial Officer ("CFO") from January 2013 to July 10, 2015.  He is named as a defendant in the Securities Class Actions.  Schafer is a citizen of New York.

22.     Defendant James A. DePalma ("DePalma") was the Company's CFO from July 10, 2015 and a member of the Board from September 2012 until his resignation from both positions on May 2, 2019.  DePalma has also been the Vice Chairman and Senior Managing Partner of Aston since August 2011.  DePalma holds a substantial personal investment in

Revolution Lighting's common stock through RVL and Aston, of which he is a member. DePalma owns 195,000 shares of Revolution Lighting common stock in his personal account. His total beneficial ownership amounts to 8,770,386 shares, or 39.23%, of Revolution Lighting's outstanding common stock.   He is named as a defendant in the Securities Class Actions. DePalma is a citizen of Connecticut.

23.     Defendant William D. Ingram ("Ingram") has been a member of the Board since September 2012.  Ingram has been a member of the Audit Committee at all relevant times.  He holds 35,058 shares of Company common stock.  Ingram is a citizen of Washington.

24.     Defendant Stephen G. Virtue ("Virtue") has been a member of the Board since September 2012.  Virtue has been a member of the Audit Committee at all relevant times.  He holds 35,058 shares of Company common stock.  Virtue is a citizen of Florida.

25.     Defendant Dennis McCarthy ("McCarthy") has been a member of the Board since September 2012.  McCarthy has been Chairman of the Audit Committee at all relevant times. He holds 36,058 shares of Company common stock.  McCarthy is a citizen of New York.

26.     LaPenta, Schafer, DePalma, Ingram, Virtue, and McCarthy are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal

interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Revolution Lighting were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

   d.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

   e.  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

  30.  Each of the Individual Defendants, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

  31.  The Company has established a Code of Business Conduct and Ethics (the "Code") for the following purpose:

> Revolution Lighting Technologies, Inc. (the "Company") is committed to conducting our business in a highly ethical manner, in accordance with applicable laws, rules and regulations and with the highest standards of business conduct. Our Code of Business Conduct and Ethics (the "Code of Conduct") sets out our basic guiding principles and applies to each employee of the Company and its subsidiaries and each member of the Company's Board of Directors. Every employee and director must be familiar with and understand the provisions of this Code of Conduct. If you are unsure whether your conduct or the conduct of others complies with this Code of Conduct, you should contact your supervisor or the Company's Chief Financial Officer. Employees may also report any

suspected noncompliance to the Chairman of the Audit Committee of the Board of Directors.

32.     The Code states:

I.     <u>Compliance with Laws, Rules and Regulations</u>

You are required to comply with all applicable governmental laws, rules and regulations that govern the conduct of our business at all times and to report any suspected violations in accordance with this Code of Conduct. If you have a question about the applicability or interpretation of any law, rule or regulation, you should contact the Chief Financial Officer. The Company will not tolerate any retaliation against any person who communicates bona fide concerns to the Company or law enforcement officials concerning a possible violation of any law, regulation or this Code.

*     *     *

III.     <u>Disclosures</u>

It is Company policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Company. The Company's senior officers and financial and accounting group are ultimately responsible for taking all necessary steps to ensure that this occurs. All employees and directors shall take appropriate steps within their areas of responsibility to ensure the same.

It is the responsibility of each employee to promptly to [sic] bring to the attention of the Chief Financial Officer or the Chairman of the Audit Committee any credible information of which he or she becomes aware that would place in doubt the accuracy and completeness in any material respect of any disclosures of which he or she is aware that have been made, or are to be made, directly or indirectly by the Company in any SEC filing or submission or any other formal or informal public communication, whether oral or written.

In addition, each employee is responsible for promptly bringing to the attention of the Chief Financial Officer or the Chairman of the Audit Committee any credible information of which he or she becomes aware that indicates any deficiency in the Company's internal control over financial reporting within the meaning of Section 404 of the Sarbanes-Oxley Act and the SEC's implementing rules, and/or the Company's disclosure controls and procedures for preparing SEC reports or other public communication as mandated by Section 302 of the Sarbanes-Oxley Act and the SEC's implementing rules, even if a materially inaccurate or incomplete disclosure by or on behalf of the Company has not resulted or is not expected imminently to result from such deficiency.

* * *

IX.    Compliance with Code of Conduct

All employees are responsible for ensuring that our standards of conduct are followed.  If you know of or suspect a violation of applicable laws, rules or regulations or this Code of Conduct, you must immediately report that information to the Chief Financial Officer or the Chairman of the Audit Committee of the Board of Directors.  While self-reporting a violation will not excuse the violation itself, the extent and promptness of such reporting will be considered in determining any appropriate sanction, including dismissal.

Violations of this Code of Conduct may result in disciplinary action, up to and including termination.  The Audit Committee of the Board of Directors shall determine, or shall designate appropriate persons to determine, appropriate action in response to violations of this Code of Conduct.

* * *

XI.    Board of Directors

With respect to their service on behalf of the Company, the Company's Board of Directors must comply with the relevant provisions of this Code of Conduct, including conflicts of interest, insider trading and compliance with all applicable laws, rules and regulations.

33.    Moreover, the Audit Committee Charter (the "Charter") states that the primary

purpose of the Audit Committee of the Board (defendants Ingram, Virtue, and McCarthy) is:

The Audit Committee (the "Committee") shall assist the Board in fulfilling its responsibility to oversee management regarding:  (i) the conduct of, and the integrity of, the Company's financial reporting to any governmental or regulatory body, shareholders, other users of Company financial reports and the public; (ii) the Company's systems of internal control over financial reporting and disclosure controls and procedures; (iii) the Company's legal regulatory compliance; (iv) the application of the Company's related-person transaction policy as established by the Board; and (v) the application of the Company's codes of business conduct and ethics as established by management and the Board.  In addition, the Committee shall oversee the qualifications, engagement, compensation, independence and performance of the registered public accounting firm that shall audit the annual financial statements of the Company (the "independent auditor") and any other registered public accounting firm engaged to prepare or issue an audit report or to perform other audit, review or attest services for the Company.  All references in this charter to the Company are intended to refer also to any subsidiary of the Company and any "variable interest

10

entity" whose results of operations are consolidated with those of the Company, except where the context otherwise requires.

34. Pursuant to the Charter, the responsibilities of the Audit Committee are as follows:

A. <u>Oversee the Engagement of the Independent Auditor:</u>

    1.    appoint, evaluate, compensate, oversee the work of, and if appropriate terminate the appointment of, the independent auditor, who shall report directly to the Committee;

    2.    pre-approve all auditing services, internal control-related services and permitted non-audit services (including the range of fees and terms thereof) to be performed for the Company by the independent auditor, subject to the de minimis exception for non-audit services described in Section 10A(i)(1)(B) of the Exchange Act that are approved by the Committee prior to the completion of the audit and, in connection with approval of any permissible tax services and services related to internal control over financial reporting, discuss with the independent auditor the potential effects of such services on the independence of the auditor;

    3.    discuss with management and the independent auditor, in connection with the annual engagement of the independent auditor, the responsibility of the auditor under generally accepted auditing standards with respect to the Company's financial statements; and review and approve the terms of the engagement of the independent auditor and the scope and expected timing of the annual audit;

    4.    (i) on an annual basis, review a formal written statement from the independent auditor delineating all relationships between the independent auditor and the Company, consistent with Public Company Accounting Oversight Board ("PCAOB") Rule 3526, "Communications with Audit Committees Concerning Independence," and discuss with the independent auditor any relationships or services that may impact the objectivity and independence of the independent auditor and take appropriate action in response to the independent auditor's statement of its relationships with the Company to satisfy itself of the independent auditor's independence; (ii) consider whether, in addition to assuring the regular rotation of the lead audit partner as required by law, in the interest of assuring continuing independence of an independent auditor, the Company should regularly rotate the firm appointed as the Company's independent auditor; and (iii) set clear

hiring policies for employees or former employees of the independent auditor;

5. at least annually, review a report by the independent auditor describing: (i) the firm's internal quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review or peer review of the firm, or by any review, inquiry or investigation by governmental or professional authorities (including the PCAOB), within the preceding five years, regarding one or more independent audits carried out by the firm, and any steps taken to deal with any such issues;

B. <u>Oversee Attest Engagements of Other Registered Public Accounting Firms</u>

6. appoint, evaluate, compensate, oversee the work of, and if appropriate terminate the appointment of any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services (including the resolution of any disagreements between management and the auditor regarding financial reporting), each of which firms shall report to the Committee, and, if such firm is required to be independent of the Company in accordance with SEC rules, review a formal written statement from the independent auditor delineating all relationships between such firm and the Company and discuss with such firm any relationships or services that may impact the objectivity and independence of the firm, and take appropriate action to satisfy itself of such firm's independence, and approve any audit-related and permitted non-audit services (including the fees and material terms thereof) to be provided by any registered public accounting firm so engaged;

C. <u>Oversee Internal Controls and Risk Management</u>

7. review and advise the chief executive officer and the Board with respect to the appointment, dismissal and replacement of the chief financial officer and chief accounting officer and consult with the chief executive officer and the Compensation Committee about the performance evaluation and compensation of each;

8. establish and oversee the effectiveness of procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting, financial reporting or auditing matters;

9.  oversee management's design and maintenance of the Company's internal control over financial reporting and disclosure controls and procedures, including reviewing and discussing with management and the independent auditor (i) management's certification in the Company's periodic SEC reports concerning the Company's disclosure controls and procedures and any reports by management or the independent auditor of a material weakness or significant deficiency in internal control over financial reporting, (ii) the actions taken to remedy any such material weakness or significant deficiency and any changes in circumstances that have, or are reasonably likely to have, a material effect on internal control over financial reporting, (iii) management's annual assessment of the adequacy of the Company's internal control over financial reporting, (iv) if and when applicable, the independent auditor's annual attestation report regarding the Company's internal control over financial reporting prior to the filing of the Company's Annual Report on Form 10-K, and (v) any identified act of fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting or disclosure controls and procedures;

10. (i) review and discuss with management and the independent auditor the Company's financial risk exposures and assess the policies and processes management has implemented to monitor and control such exposures, (ii) assist the Board in fulfilling its oversight responsibilities regarding the Company's policies and processes with respect to risk assessment and risk management, including any significant non-financial risk exposures, and (iii) review the Company's annual disclosures concerning the role of the Board in the risk oversight of the Company, such as how the Board administers its oversight function;

D.  Oversee Financial Reporting and Auditing

11. review and discuss with management and the independent auditor: (i) the critical accounting policies and practices used by the Company, the accounting treatment to be applied in respect of significant new transactions or other significant events not in the ordinary course of the Company's business and any significant changes in management's selection or application of accounting principles; (ii) alternative accounting treatments within generally accepted accounting principles ("GAAP") for material items that have been discussed by the independent auditor with management, including the ramifications of the use of such treatments and the treatment preferred by the independent auditor, and other material written communications between the independent auditor and

management such as a schedule of unadjusted differences; (iii) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences; and (iv) the effect of regulatory and accounting initiatives on the Company's financial statements;

12.   review and, as pertinent, discuss with management and the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit, including: (i) any significant difficulties encountered in the course of audit work, including any restrictions on the scope of audit activities or on access to requested information; (ii) any special audit steps adopted by the independent auditor in light of any material weakness in the Company's internal control over financial reporting; (iii) any material changes required in the scope of the audit plan; (iv) any significant disagreements with management and (v) periodically, the status of the Company's response to previous audit recommendations;

13.   oversee the Company's financial reports, including: (i) resolve any disagreements regarding financial reporting between management and the independent auditor; (ii) review any significant findings by the independent auditor relating to the preparation of the Company's financial statements; (iii) review and discuss with management and the independent auditor, prior to public release, the Company's annual and quarterly financial statements to be filed with the SEC including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; (iv) prior to release of the annual audited financial statements, meet with the independent auditor without any management member present to discuss the independent auditor's views about the qualitative aspects of the Company's significant accounting practices; (v) recommend to the Board whether to include the audited annual financial statements in the Company's Annual Report on Form 10-K to be filed with the SEC; and (vi) prior to submission to any governmental authority of (a) any financial statement of the Company that differs from the financial statements filed or to be filed by the Company with the SEC or (b) any financial statement of a subsidiary of the Company that in the Committee's judgment is material to the Company and that presents information regarding such subsidiary in a way that is materially different from the presentation of such information in the financial statements of the Company filed or to be filed with the SEC, review such financial statements and any report, certification or opinion thereon provided by an independent auditor;

14.    review and discuss with management and the independent auditor any material off-balance sheet financing and any other material financial arrangement that does not appear in the financial statements of the Company;

15.    discuss with management the Company's earnings press releases and review financial information and earnings guidance provided to analysts and to rating agencies, including any such dissemination of financial information not involving the presentation of financial measures in accordance with GAAP;

E.    <u>Oversee Legal and Ethical Compliance</u>

16.    obtain reports from management that the Company and its subsidiaries are in conformity with applicable legal requirements and the Company's code(s) of business conduct and ethics and advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations, and with the Company's code(s) of business conduct and ethics;

17.    review periodically with a member of management: (i) legal and regulatory matters that may have a material impact on the Company's financial statements, including any material reserves for legal contingencies and any related financial statement disclosure, and (ii) the scope and effectiveness of the Company's legal and regulatory compliance policies and programs;

18.    in accordance with, and to the extent provided by, the pertinent policies that shall be adopted by the Board upon recommendation of the Committee, review (on an ongoing basis, as appropriate) and approve or ratify on behalf of the Company, if appropriate, any proposed, on-going or completed transaction involving the Company and (i) any director or executive officer of the Company, (ii) any owner of 5% or more of any class or series of shares of the Company or (iii) such other person serving as an officer or member of the senior management of the Company or as a member of the board of directors or similar governing body of any subsidiary of the Company as may be designated in accordance with such policy or (iv) any member of the family of, or any company or other entity affiliated with, any such person, in each case considering any audit procedures or safeguards of the Company's interests appropriate to be instituted in connection with such transaction; and

19.    review at least annually with management, including a member of the Legal Department and the head of the internal audit function,

compliance with, the adequacy of and any requests for waivers under, the Company's code(s) of business conduct and ethics (including codes that apply to all employees as well as those applicable to directors and officers) and the Company's policies and procedures concerning trading in Company securities, and make a recommendation to the full Board with regard to any approval or waiver under such code sought with respect to any executive officer or director.

35. As described below, the Audit Committee failed in these responsibilities.

## SUBSTANTIVE ALLEGATIONS

**Background**

36. Revolution Lighting designs, manufactures, markets, and sells LED lighting solutions focusing on the industrial, commercial, and government markets in the United States, Canada, and internationally. The Company offers interior and exterior LED lamps and fixtures, including signage and control systems. Its products are used for interior use, outdoor use, new fixture installation, retrofit installation, smart grid control systems, and integration of LED technology into custom applications.

37. The Company is the successor by merger to a corporation named Super Vision International, Inc., which was incorporated in January 1991. In April 2007, the Company changed its name from Super Vision International, Inc. to Nexxus Lighting, Inc. ("Nexxus").

38. On September 12, 2012, RVL, an affiliate of Aston, made an investment of $6 million in exchange for newly-created Series B Convertible Preferred Stock, $.001 par value per share, representing 73% of the Company's outstanding voting stock. The RVL investment resulted in a change in control under applicable NASDAQ regulations. In connection with the RVL investment, defendant LaPenta was named Chairman of the Board and CEO, and the Company changed its name from Nexxus to Revolution Lighting.

39.    In August 2013, Revolution Lighting acquired Relume Technologies, a manufacturer of LED lighting products and control systems.  In April 2014, Revolution Lighting acquired Value Lighting Inc., a supplier of lighting solutions to the multifamily residential market.

40.    Defendant LaPenta exerts a significant amount of influence over the Company due to his substantial control of Company shares and his positions at the Company.  Indeed, the Company candidly acknowledges its dependence on him stating:

> If we are unable to attract or retain qualified personnel, our business and product development efforts could be harmed.
>
> **To a significant extent, our success will depend on our senior management team, including the Chairman, Chief Executive Officer and President Robert V. LaPenta,** and other members of the executive team.  The loss of any of these individuals could severely harm the business.  Our success also depends on our continued ability to identify, attract, hire, train, retain and motivate highly skilled technical, managerial, manufacturing, administrative and sales and marketing personnel.  Competition for these individuals is intense, and we may not be able to successfully recruit, assimilate or retain sufficiently qualified personnel.  In particular, we may encounter difficulties in recruiting and retaining a sufficient number of qualified technical personnel, which could harm our ability to develop new products and adversely impact our relationships with existing and future customers.  The inability to attract and retain necessary technical, managerial, manufacturing, administrative and sales and marketing personnel could harm our ability to obtain new customers and develop new products and could adversely affect our business and operating results.

(Emphasis added).

### The Individual Defendants Cause the Company to Issue Materially False and Misleading Statements During the Relevant Period

41.    On March 14, 2014, Revolution Lighting filed its annual report on Form 10-K for the period ended December 31, 2013 (the "2013 10-K").  It reported revenue of $26.06 million.  Regarding Revolution Lighting's revenue recognition policy, the 2013 10-K stated:

> We recognize revenue for our products upon shipment or delivery to customers in accordance with the respective contractual arrangements, provided no significant obligations remain and collection is probable.  For sales that include customer

acceptance terms, revenue is recorded after customer acceptance. It is our policy that all sales are final. Requests for returns are reviewed on a case by case basis.

As revenue is recorded, we accrue an estimated amount for product returns as a reduction of revenue.

Revenues from merchandise shipped to a logistics supplier for Seesmart, who had the contractual right to return merchandise in inventory, was recognized when the merchandise was delivered by the logistics supplier to the end user. Payments received from the logistics supplier prior to recognizing the related revenue are recorded as customer deposits. During the first quarter of 2013, this arrangement was terminated.

Pursuant to agreements with distributors, which provide the distributors with the rights to purchase and resell inventory, we receive up front licensing fees for ongoing support obligations during the term of the agreement. Such fees are amortized by us over the term of the contracts which range from three to ten years. Unamortized licensing fees are included in deferred revenue in the accompanying consolidated balance sheets.

Sales taxes billed to customers are recorded on a gross basis as revenues. From time to time, we enter into multiple element arrangements to provide products and installation services. Revenues are allocated to each element based on our best estimate of the selling prices of each element.

42.     The 2013 10-K contained certifications by defendants LaPenta and Schafer attesting that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting. Defendants LaPenta, Schafer, DePalma, Ingram, McCarthy, and Virtue also signed the 2013 10-K.

43.     On May 12, 2014, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2014 (the "1Q14 10-Q") and reported revenue of $4.95 million.

44.     The 1Q14 10-Q contained certifications by defendants LaPenta and Schafer attesting that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting. Moreover, the report stated that "[t]here was no change in [the Company's] internal controls over financial

reporting that occurred during the quarter ended March 31, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

45.     On August 7, 2014, Revolution Lighting filed its quarterly report on Form 10-Q for the period ended June 30, 2014 (the "2Q14 10-Q") and reported revenue of $17.52 million.

46.     The 2Q14 10-Q contained certifications by defendants LaPenta and Schafer attesting that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting.  Under the heading "Controls and Procedures," the report stated, in relevant part:

> During the second quarter of 2014, the Company implemented new accounting systems and related modifications of processes and controls at its Relume and Lumificient subsidiaries.  The Company also hired Directors of Finance at its Relume, Seesmart and newly acquired Value Lighting subsidiaries and expanded its accounting resources at its corporate headquarters and Value Lighting subsidiaries.

47.     On November 6, 2014, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2014 (the "3Q14 10-Q") and reported revenue of $26.88 million.

48.     The 3Q14 10-Q contained certifications by defendants LaPenta and Schafer attesting that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting.  Moreover, the report stated that "[t]here was no change in [the Company's] internal controls over financial reporting that occurred during the quarter ended September 30, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

49.     On March 16, 2015, Revolution Lighting filed its annual report on Form 10-K for the period ended December 31, 2014 (the "2014 10-K").  For 2014, the Company reported revenue of $76.85 million.

50.     The 2014 10-K contained certifications by defendants LaPenta and Schafer attesting that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting.  Defendants LaPenta, Schafer, DePalma, Ingram, McCarthy, and Virtue also signed the 2014 10-K.

51.     On November 5, 2015, Revolution Lighting filed its quarterly report on Form 10-Q for the period ended September 30, 2015 (the "3Q15 10-Q").  This report contained certifications by defendants LaPenta and DePalma attesting that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting.

52.     The 3Q15 10-Q reported revenue of $37.73 million for the quarter.  It also disclosed a different revenue recognition policy than in prior periods as identified in ¶ 41.  The 2Q15 10-Q stated, in relevant part:

> The Company recognizes revenue for its products upon shipment or delivery to customers in accordance with the respective contractual arrangements, provided no significant obligations remain and collection is probable.  For sales that include customer acceptance terms, revenue is recorded after customer acceptance.  It is the Company's policy that all sales are final.  Requests for returns are reviewed on a case-by-case basis.  As revenue is recorded, the Company accrues an estimated amount for product returns as a reduction of revenue.

> The Company recognizes revenue from fixed-price and modified fixed-price contracts for turnkey energy conservation projects using the percentage-of-completion method of accounting.  The percentage-of-completion is computed by dividing the actual incurred cost to date by the most recent estimated total cost to complete the project.  The computed percentage is applied to the expected revenue for the project to calculate the contract revenue to be recognized in the current period.  This method is used because management considers total cost to be the best available measure of progress on these contracts.  Contract costs include all direct material and labor costs and indirect costs related to contract performance.  Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are determined.

53.     On March 10, 2016, Revolution Lighting filed its annual report on Form 10-K for the period ended December 31, 2015 and reported revenue of $129.66 million (the "2015 10-K").  The 2015 10-K contained certifications by defendants LaPenta and DePalma attesting that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting.  Defendants LaPenta, DePalma, Ingram, McCarthy, and Virtue also signed the 2015 10-K.

54.     On March 9, 2017, Revolution Lighting filed its annual report on Form 10-K for the period ended December 31, 2016 and reported revenue of $172.12 million (the "2016 10-K").  The 2016 10-K contained certifications by defendants LaPenta and DePalma attesting that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting.  Defendants LaPenta, DePalma, Ingram, McCarthy, and Virtue also signed the 2016 10-K.

55.     On March 8, 2018, Revolution Lighting filed its annual report on Form 10-K for the period ended December 31, 2017 and reported revenue of $152.31 million (the "2017 10-K").  The 2017 10-K contained certifications by defendants LaPenta and DePalma attesting that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting.  Moreover, the report stated that "management concluded that [the Company's] disclosure controls and procedures were effective at a reasonable assurance level as of the end of the period covered by the report."  Defendants LaPenta, DePalma, Ingram, McCarthy, and Virtue also signed the 2017 10-K.

56.     On May 1, 2018, Revolution Lighting filed its quarterly report on Form 10-Q for the period ended March 31, 2018 and reported revenue of $33.74 million.  This report contained certifications by defendants LaPenta and DePalma attesting that the financial information

contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting. Moreover, the report stated, in relevant part:

> [M]anagement concluded that [the Company's] disclosure controls and procedures were effective at a reasonable assurance level as of the end of the period covered by the report.
>
> *       *       *
>
> Beginning January 1, 2018, we implemented ASC 606, "*Revenue from Contracts with Customers*." Although the new revenue standard had an immaterial impact on our ongoing net income, we did implement changes to our processes related to revenue recognition and the control activities within them. These included the development of new policies based on the five-step model provided in the new revenue standard, new training, ongoing contract review requirements, and gathering of information provided for disclosures.

57.       On August 13, 2018, Revolution Lighting filed its quarterly report on Form 10-Q for the period ended June 30, 2018 (the "2Q18 10-Q") and reported revenue of $36.44 million.

58.       The 2Q18 10-Q reported a material weakness in Revolution Lighting's financial reporting. Under the heading "Controls and Procedures," the Company stated, in relevant part:

> As of December 31, 2017, our management conducted an evaluation of our internal control over financial reporting and determined that our internal control over financial reporting was effective. At such date we identified a significant deficiency related to the controls over the proper identification of certain collection patterns relevant for bill and hold revenue recognition. Since December 31, 2017, our management has implemented changes in internal control over financial reporting to address this significant deficiency, including changing the design of existing controls and implementing additional transaction level and review controls. In addition, corporate management is strengthening the internal accounting functions at the divisional or subsidiary level, where appropriate.
>
> At June 30, 2018, we have determined that certain of the transaction level and review controls over revenue recognition have not operated effectively. Specifically, our management has identified control deficiencies related to the proper identification of certain collection patterns and the finalization and review of executed contracts related to bill and hold arrangements and controls over the recording of material costs. We have determined that these control deficiencies aggregate to a material weakness at June 30, 2018.

59.     The above statements identified in ¶¶ 41-58 were materially false and/or misleading and failed to disclose material adverse facts about Revolution Lighting's business, operations, and prospects.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Revolution Lighting was improperly recognizing revenue for certain transactions; (ii) as a result, Revolution Lighting's financial statements were misstated; (iii) Revolution Lighting lacked adequate internal controls over financial reporting; (iv) as a result, Revolution Lighting would be subject to regulatory scrutiny and incur substantial costs; and (v) as a result of the foregoing, the Individual Defendants' positive statements about Revolution Lighting's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Begins to Emerge**

60.     On October 17, 2018, Revolution Lighting reported preliminary financial results for the third quarter of 2018 with revenue expected to be $33 million, compared to previously-announced guidance of $40-$41 million.  Revolution Lighting also announced that defendant LaPenta had offered to acquire all of the common stock of the Company for a price of $2.00 per share.  In a press release titled "Revolution Lighting Technologies (RVLT) Provides Preliminary Third Quarter Update and Revises Full Year Guidance," the Company stated, in relevant part:

> While the company has been successful in winning a number of important projects, it continues to experience delays in starting and or shipping against these projects particularly at our multifamily and Tri-State divisions.  As a result, we expect revenue of approximately $33 million for the third quarter versus prior third quarter guidance of $40-$41 million.  Due to the decline in expected third quarter revenue and our current outlook for the fourth quarter, total revenue for the full year 2018 is expected to approximate $140-$145 million versus our previous full year guidance of $160-$170 million.
>
> We are disappointed in our results and recognize that we need to address our overall business structure, reduce operating costs to a level more aligned with our revenue expectations and address our level of outstanding debt.  Over the past six months, our CEO and Chairman, Robert LaPenta, has provided approximately

$15 million of capital to fund operations, bringing our total debt, including bank financing, to over $60 million. Mr. LaPenta believes additional capital requirements cannot presently be addressed through third party financing.

Mr. LaPenta has proposed to acquire all of the common stock of the Company that he and his affiliates do not currently own. The text of Mr. LaPenta's letter to the Company's independent directors appears in full below:

We write to you in connection with your roles as independent, disinterested members of the Board of Directors of Revolution Lighting Technologies, Inc. (the "Company") and on behalf of RVL 1, LLC (together with its affiliates and certain related persons, "we" or "us"). As you are aware, we beneficially own approximately 46% of the Company's outstanding common stock and have provided various capital support to the Company in the form of letters of support, guarantees under the Company's Revolving Credit Facility and promissory notes.

\*       \*       \*

Without additional funding, we believe that the Company may be forced to consider various restructuring alternatives in the near term.

Simply put, we do not believe that it is in the best interests of the Company and its stockholders to continue as a publicly traded enterprise, as we believe it currently lacks sufficient scale and the ongoing costs of maintaining the reporting and related infrastructure necessary for public reporting are a significant financial burden on the Company. In addition, we believe the constant pressure to meet quarterly earnings targets has been a significant distraction to the Company's management and has prevented management from appropriately focusing on the long term growth and the development of the Company's business.

***As a result of the above factors, we propose to acquire all of the common stock of the Company that we do not currently own for a price of $2.00 per share.*** Given our familiarity with the Company, we would not need to conduct any further due diligence on the Company and would be in a position to sign a definitive transaction agreement quickly.

(Emphasis in original).

61.     On this news, Revolution Lighting's stock price fell $0.98 per share, or over 38%, to close at $1.58 per share on October 17, 2018, on unusually heavy trading volume.

62.     On October 19, 2018, the Company disclosed "an ongoing investigation by the SEC regarding certain revenue recognition practices, including bill and hold transactions that occurred between 2014 through the second quarter of 2018." In a press release titled

"Revolution Lighting Provides Additional Clarity Regarding its Recent Preliminary Third Quarter Results Issued on October 17, 2018," Revolution Lighting revealed the estimated impact on revenue of an accounting policy "based on shipment of products, as opposed to bill and hold revenue recognition," stating, in relevant part:

> Management does not believe that revenue reduction described in the release is due to any loss or deterioration of the Company's business or from the discontinuation of bill and hold transactions that are the subject of an investigation by the Securities and Exchange Commission ("SEC"), as described below, but rather resulted from the timing of the start and completion of programs during the third quarter at the Company's Value and Tristate divisions. These delays, plus a revised more conservative outlook regarding the fourth quarter revenue guidance, resulted in the reduced outlook for the year.

> There is currently an ongoing investigation by the SEC regarding certain revenue recognition practices, including bill and hold transactions that occurred between 2014 through the second quarter of 2018. The Company estimates that the net effect on the reported revenue as a result of, among other things, recording revenue based on shipments of products, as opposed to bill and hold revenue recognition used by the Company, would have been to reduce revenue by $5.0 million, $6.3 million and $6.3 million in each of 2014, 2015 and 2016, respectively, and increase revenue by $11.6 million and $5.1 million in 2017 and 2018, respectively. In connection with the results of the investigation to date, the Company is in the process of assessing its revenue recognition policies and the resulting effects on its financial results, and adopting remedial measures to improve its internal controls as described in its Form 10-Q for the second quarter of 2018. The SEC investigation is ongoing and there can be no assurance as to whether additional remedial measures will be required. The Company will continue to cooperate with the SEC regarding the investigation.

*     *     *

> The Company expects an Adjusted EBITDA loss for the third quarter of approximately $2-$3 million and cash flow from operations during the third quarter was approximately break-even. Also as previously disclosed, during the third quarter Mr. LaPenta exchanged $3 million of debt for equity. As a result of the operational cash flow and the debt for equity exchange, overall company debt decreased from $62.8 million at June 30, 2018 to $60.4 million at September 30, 2018.

> The reduced revenue for the third quarter of 2018 ($33 million versus $40-$42 million) and the lower revenue outlook for the fourth quarter reduced the expected collateral availability under our bank facility. Due to the lack of bank line availability, it became obvious that additional capital would be required to support

operations. As described in the release and our prior filings with the SEC, Mr. LaPenta has historically provided financing to fund any shortfall in working capital and has provided over $15 million to date in 2018. Mr. LaPenta intends to continue to support these requirements in the near term. Also, Mr. LaPenta believes in addition to reducing expenses associated with being a public company, the Company could also focus additional expense reduction initiatives that would be best accomplished as a private company. The Company has prepared forecasts of its cash flow needs based on anticipated revenue, borrowing capacity, cash receipts and disbursements and expects that it will need approximately $5-$10 million in additional funding through the end of the year. Mr. LaPenta is expected to continue to fund the Company through continued periodic loans as required. Over the past two weeks, Mr. LaPenta has provided additional financing of $2 million and expects to increase his support by another $3 million in the coming weeks. In addition, the Company is working with its existing lender to provide additional funding above its current capacity, and anticipates that it will request covenant waivers to assist it during the pendency of the independent committee's review of strategic alternatives.

63. On this news, Revolution Lighting's stock price fell $0.16 per share, or over 10%, to close at $1.43 per share on October 22, 2018, on unusually heavy trading volume.

64. On November 13, 2018, the Company filed a Notice of Late Filing on Form 12b-25 with the SEC. Therein, Revolution Lighting stated that it was unable to file its quarterly report for the period ended September 30, 2018 due to a review by the Company's Audit Committee of previously filed financial statements, and provided additional details regarding the incorrect recognition of revenue. Revolution Lighting stated, in relevant part:

Beginning in 2014, the Company used bill and hold revenue accounting principally for certain contracts in its Multi-family division between its Value Lighting subsidiary and its customers. Upon satisfaction of specific requirements imposed by accounting principles and interpretations of the SEC staff, bill and hold revenue accounting permits a company to record revenue on products segregated for delivery within its own warehouse. Absent satisfaction of these requirements, revenue recognition generally should await delivery of products to customers.

The Company's Audit Committee also is conducting a review to assess the accuracy of the Company's previously filed financial statements, the current focus of which is to review the extent to which the Company incorrectly recognized revenue with respect to bill and hold transactions from 2014 until the second quarter of fiscal 2018, and whether the Company's accounting for those transactions led to material errors in its financial statements. If this ongoing

review results in a conclusion that the Company made material errors in its financial statements, the Company would restate the affected financial statements to the extent required. In any such restatement, some revenue recognized in prior periods would be recognized in later periods. While the Audit Committee review is ongoing, the Company will not be able to provide financial statements for the fiscal quarter ended September 30, 2018.

65. On November 13, 2018, the Company disclosed additional loans from defendant LaPenta to the Company, approved by the Audit Committee. Revolution Lighting stated, in relevant part:

> As previously disclosed in the press release of Revolution Lighting Technologies, Inc. ("Revolution" or the "Company"), issued on October 19, 2018, Robert V. LaPenta, Sr., Revolution's Chairman and CEO, has funded and has informed the Company that he intends to continue to fund the Company through continued periodic loans to the extent consistent with what he believes to be the best interests of the Company and its stockholders. In October 2018, Mr. LaPenta provided a total of $9.5 million in funding (the "October Funding"), consisting of the $2.0 million in funding disclosed in the Company's press release issued on October 19, 2018 and further advances of $2.5 million and $5.0 million made on October 25, 2018 and October 31, 2018, respectively.
>
> On November 10, 2018, the Audit Committee of Revolution's Board of Directors ratified and approved the terms on which the October Funding was provided. The funding and the approved terms have been memorialized in a promissory note, entered into by Revolution and Mr. LaPenta, dated as of November 12, 2018 (the "Note").
>
> Subject to specified exceptions, amounts outstanding under the Note bear interest from the date of advance at a rate per annum equal to one-month LIBOR plus 3.75%, calculated on the basis of a 360-day year and the actual number of days elapsed. The principal and interest are payable upon maturity. The Note matures on July 20, 2020. If Mr. LaPenta makes additional short-term advances to the Company that are not repaid within 90 days, the Note may be amended in Revolution's discretion to include the amount of any such advances.
>
> The Note contains customary events of default, including nonpayment of principal or interest when due; assignment without consent of the lender; or the occurrence of certain bankruptcy, insolvency or liquidation-related events. Upon the occurrence of an event of default, any outstanding amounts under the Note may be accelerated; provided, however, that upon the occurrence of certain bankruptcy, insolvency or liquidation-related events of default, all amounts payable under the Note will automatically become immediately due and payable. The Note does not contain financial or restrictive covenants.

Revolution is working with its existing bank lender to restructure its debt, which as of November 12, 2018 consisted of $65.0 million of aggregate principal and interest outstanding under notes from Mr. LaPenta, and Mr. LaPenta's affiliates, RVL 1 LLC and Aston Capital, LLC, and under Revolution's bank line of credit and other debt, and to obtain covenant waivers or a forbearance agreement under the bank line of credit. Although the Company believes that an advantageous restructuring can be completed in the near term, there can be no assurance that all parties will be able to agree on all terms necessary to close the contemplated restructuring.

Revolution believes that the $9.5 million Mr. LaPenta recently loaned to the Company, together with an expected $2.5 million of additional loans that Mr. LaPenta intends to provide and up to an additional $4.5 million of loans from Mr. LaPenta or other sources, are likely to be sufficient for the Company's liquidity needs to fund operations in the ordinary course, including the anticipated costs necessary to fund the previously announced investigation of the Company by the Securities and Exchange Commission (the "SEC") and the review being conducted by the Company's Audit Committee, through the end of 2018. Additional funding may be necessary before the end of 2018 based on unforeseen circumstances and the Company expects that it will need additional funding to continue its operations beyond the end of 2018, with the extent of additional funds required dependent on the Company's results of operations in the fourth quarter of 2018 and future periods and the amount of time and expense necessary to complete the previously announced SEC investigation of the Company, the review being conducted by the Company's Audit Committee and any other related costs.

66.     On November 14, 2018, Revolution Lighting announced that its Transaction Committee, composed of defendants Ingram, McCarthy, and Virtue, was considering an updated proposal from defendant LaPenta to acquire all of the Company's outstanding stock for $1.50 per share. Revolution Lighting stated, in relevant part:

Revolution Lighting Technologies, Inc. (NASDAQ: RVLT) ("Revolution Lighting" or the "Company"), a global provider of advanced LED lighting solutions announced today that on November 14, 2018, the Transaction Committee of the Board of Directors of the Company received a revised proposal from RVL I LLC, an affiliate of the Company's Chairman and CEO, Robert V. LaPenta, to acquire all of the outstanding common stock of the Company. The Transaction Committee is in the process of considering the proposal with assistance from its advisors and will have no comment until its evaluation is complete. The text of the letter to the Transaction Committee of the Company's Board of Directors appears in full below:

We write in connection with our October 16, 2018 letter (the "Offer Letter") regarding our offer to acquire all of the common stock of Revolution Lighting Technologies, Inc. (the "Company") on behalf of RVL 1, LLC (together with its affiliates and certain related persons, "we" or "us") that we do not own.

\*     \*     \*

Over the last month, we have provided the Company with $7.5 million in debt financing, and we may be required to provide up to an additional $7.0 million in debt financing to fund the Company's operations in the ordinary course through the end of 2018. We further understand that the Company may require additional funding in 2018 in the event of unforeseen circumstances, and we expect the Company to require additional funds to continue its operations beyond 2018, with the extent of such additional required funds depending upon the Company's future results of operation and the amount of time and expense necessary to complete the previously disclosed SEC investigation and the Audit Committee's review of the Company's historical financial statements and other related costs. We intend to continue to fund the Company through continued periodic loans to the extent consistent with what we believe to be the best interests of the Company and its stockholders.

The Company's overall debt as of November 12, 2018 was $65.0 million and, as noted above, will rise further as additional debt financing is provided. This *increased amount of debt, which exceeds the amount that we expected the Company to have at the time of our Offer Letter, as well as an anticipated delay in completing a going private transaction and the developments in the Company's business that it has disclosed, including the SEC investigation and the Audit Committee's review, will necessitate a decrease from the $2.00 per share offer contained in our Offer Letter to a revised offer of $1.50 per share*.

67.     On this news, the Company's stock price fell $0.55 per share, or nearly 40%, to close at $0.85 per share on November 15, 2018, on unusually heavy trading volume.

68.     On November 20, 2018, the Company disclosed that "on November 15, 2018, the Company entered into a promissory note with Mr. LaPenta (the 'Note'), pursuant to which he lent the Company an additional $1 million. The Note was part of the $2.5 million in expected additional loans from Mr. LaPenta disclosed in the November 13 Form 8-K. The Audit

Committee of the Company's Board of Directors approved the terms of the Note on November 14, 2018."

69.     On November 26, 2018, the Company disclosed that "on November 21, 2018, the Company completed a series of transactions with Bank of America, Aston and Mr. LaPenta" for the purpose of restructuring "its outstanding debt obligations."  Specifically, it was disclosed that "LaPenta may elect to provide up to $5.0 million in loans to the Company . . . subject to approval by the Audit Committee" and that "[a]ny additional loans to the Company in excess of $5.0 million from Mr. LaPenta or Aston would require the approval of both the Audit Committee of the Board of Directors and Bank of America."

70.     On December 11, 2018, the Company filed a Form 8-K with the SEC disclosing additional monies LaPenta had loaned the Company stating:

> On December 6, 2018, Mr. LaPenta loaned the Company an additional $2 million, and the Company issued to Mr. LaPenta a new promissory note (the "Note") with an aggregate principal amount of $2 million.  The Audit Committee of the Company's Board of Directors ratified the terms of the Note on December 10, 2018.  As of December 10, 2018, the Company had total debt of approximately $67.0 million, including approximately $40.5 million in aggregate principal and interest under loans from Mr. LaPenta and Aston.

71.     On December 11, 2018, the Company filed a formed Form 8-K with the SEC providing an update regarding the Audit Committee's investigation of previously-filed financial statements stating:

> As previously disclosed in the Form 12b-25 filed by the Company on November 13, 2018, the Company's Audit Committee is conducting a review to assess the accuracy of the Company's previously filed financial statements, the current focus of which is to review the extent to which the Company incorrectly recognized revenue with respect to bill and hold transactions beginning in 2014 until the second quarter of fiscal 2018, the period for which it used bill and hold revenue accounting, and whether the Company's accounting for those transactions led to material errors in its financial statements.
>
> On December 10, 2018, the Audit Committee, upon the recommendation of the Company's management, concluded that, as a result of the information obtained

to date in connection with the ongoing review, the Company's consolidated financial statements as of and for each of the following fiscal periods should no longer be relied upon:

- the fiscal quarters ended March 31, 2018 and June 30, 2018;

- the fiscal year ended December 31, 2017 and each fiscal quarter therein;

- the fiscal year ended December 31, 2016 and each fiscal quarter therein; and

- the fiscal year ended December 31, 2015 and each fiscal quarter therein.

To date, the Audit Committee's review has focused principally on the analysis of selected bill and hold transactions in 2016. Based on currently available information and documentation, the Company has identified apparent errors in its previously filed financial statements for 2016, the correction of which would be material to its previously filed financial statements for 2017. If additional information with respect to the selected 2016 transactions becomes available, this conclusion may be reassessed. The Audit Committee will continue to assess the accuracy of the Company's previously filed financial statements for the fiscal periods listed above, and will assess the impact of the errors on the Company's disclosure controls and procedures and internal control over financial reporting.

Accordingly, until the Company has either restated its financial statements for the periods described above or determined that no such restatements are warranted, investors, analysts and other persons should not rely upon the Company's previously released financial statements for these periods, including those included in the Company's Annual Reports on Form 10-K and its Quarterly Reports on Form 10-Q, or any press releases, investor presentations or other communications that relate to that information. Additionally, the Audit Committee has determined that the related reports on the consolidated financial statements and internal control over financial reporting for the fiscal years ended December 31, 2017, 2016 and 2015 of the Company's independent registered public accounting firm, RSM US LLP, should also no longer be relied upon. The Audit Committee has discussed the matters disclosed in this Item 4.02 with RSM US LLP.

72. Following this announcement, in a December 13, 2018 article in *Stamford Advocate*, Stephen Root, a professor of accounting in New York University's business school, described Revolution Lighting's issues as follows, "Recognizing revenue prematurely,

particularly over numerous years – as appears to be the case here – is generally viewed as a serious accounting error.  This is suggestive that there were not very good internal controls."

73.     On January 3, 2019, the Company received a notification from NASDAQ informing the Company that, for the last 30 consecutive business days, the closing bid price for the Company's common stock was below the minimum $1.00 per share required pursuant to Nasdaq Listing Rule 5550(a)(2).

74.     On January 18, 2019, the Company disclosed additional monies LaPenta had loaned the Company, stating:

> On January 17, 2019, Mr. LaPenta loaned the Company an additional $2 million, and the Company issued to Mr. LaPenta a new promissory note (the "Note") with an aggregate principal amount of $2 million.  The Audit Committee of the Company's Board of Directors approved the terms of the Note on January 16, 2019.  As of January 17, 2019, the Company had total debt of approximately $67.6 million, including approximately $42.5 million in aggregate principal and interest under loans from Mr. LaPenta and Aston.

75.     On February 14, 2019, the Company filed a Form 8-K with the SEC disclosing additional monies LaPenta had loaned the Company, stating:  "On February 8, 2019, Mr. LaPenta loaned the Company an additional $2.0 million, and the Company issued to Mr. LaPenta a new promissory note (the 'Note') with an aggregate principal amount of $2.0 million.  The Audit Committee of the Company's Board of Directors approved the terms of the Note on February 7, 2019."

76.     On March 11, 2019, the Company filed a Form 8-K with the SEC announcing that LaPenta had rescinded his offer to take the Company private, stating:  "On March 7, 2019, the Special Committee of the Board of Directors of Revolution Lighting Technologies, Inc. (the 'Company') received a letter from RVL 1, LLC, an affiliate of Robert V. LaPenta, Sr., the Company's Chairman, CEO and President, notifying the Company that it is withdrawing its prior

proposal to acquire all of the outstanding shares of the Company's common stock and pursue a going-private transaction."

77.    On March 27, 2019, the Company filed a Form 8-K with the SEC disclosing additional monies LaPenta had loaned the Company, stating: "On March 22, 2019, Mr. LaPenta loaned the Company an additional $2.0 million, and the Company issued to Mr. LaPenta a new promissory note (the 'Note') with an aggregate principal amount of $2.0 million. The Audit Committee of the Company's Board of Directors approved the terms of the Note on March 25, 2019. As of March 25, 2019, the Company had total debt of approximately $68.2 million, including approximately $46.6 million in aggregate principal and interest under loans from Mr. LaPenta and Aston."

78.    On April 18, 2019, the Company filed a Form 8-K with the SEC disclosing additional monies LaPenta had loaned the Company, stating: "On April 12, 2019, Mr. LaPenta loaned the Company an additional $1.5 million, and the Company issued to Mr. LaPenta a new promissory note (the 'Note') with an aggregate principal amount of $1.5 million. The Audit Committee of the Company's Board of Directors ratified the terms of the Note on April 14, 2019. As of April 15, 2019, the Company had total debt of approximately $72.1 million, including approximately $48.4 million in aggregate principal and interest under loans from Mr. LaPenta and Aston."

## DAMAGES TO REVOLUTION LIGHTING

79.    As a result of the Individual Defendants' wrongful conduct, Revolution Lighting disseminated false and misleading statements and omitted material information to make such statements false and misleading when made. The improper statements have devastated Revolution Lighting's credibility. Revolution Lighting has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

80.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Revolution Lighting and defendants LaPenta, Schafer, and DePalma to at least three lawsuits for violations of the federal securities laws, captioned *Bishop v. Revolution Lighting Technologies, Inc.*, 19 Civ. 2722; *Hubner v. Revolution Lighting Technologies, Inc.*, 19 Civ. 2308; and *Glavan v. Revolution Lighting Technologies, Inc.*, 19 Civ. 980, all pending in the United States District Court for the Southern District of New York (collectively, the "Securities Class Actions").

81.     Thus, as a result of the Individual Defendants' misconduct, Revolution Lighting has sustained damages, including, but not limited to:  (1) costs and expenses incurred from having to defend and possibly settle the Securities Class Actions; (2) costs and expenses incurred from the SEC investigation; and (3) costs and expenses incurred from the investigation by the Audit Committee into the Company's financial statements.  Indeed, in the Form 8-K filed with the SEC on December 11, 2018, the Company admitted that it "expects that expenses arising from the Audit Committee's review and any restatement of financial statements, which will be recorded in the periods incurred, will be significant."

82.     Moreover, these actions have irreparably damaged Revolution Lighting's corporate image and goodwill.  For at least the foreseeable future, Revolution Lighting will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Revolution Lighting's ability to raise equity capital or debt on favorable terms in the future is now impaired.

83. Finally, as a direct and proximate result of the Individual Defendants' actions as alleged above, Revolution Lighting's market capitalization has decreased by over $16.5 million and the Company has taken on a burdensome debt of over $72.1 million.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84. Plaintiffs bring this action derivatively for the benefit of the Company to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties.

85. Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

86. Plaintiffs are owners of Revolution Lighting common stock and were owners of Revolution Lighting common stock at all times relevant hereto.

87. At the time this action was commenced, the Board consisted of five directors: defendants LaPenta, Ingram, Virtue, and McCarthy (the "Director Defendants"), and non-defendant Robert Basil, Jr. ("Basil"). Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

**Demand is Futile as to All Director Defendants because the Director Defendants Face a Substantial Likelihood of Liability**

88. The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

89.     Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially-inflated prices and misrepresented the financial health of Revolution Lighting.

90.     The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to recognize revenue for certain transactions, failure to take necessary and appropriate steps to ensure that the Company's internal controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties and have resulted in the Director Defendants facing a substantial likelihood of liability as the Company is facing an SEC investigation and its financial statements are under internal review.   If the Director Defendants were to bring a suit on behalf of Revolution Lighting to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**Defendants Ingram, Virtue, and McCarthy as Audit Committee Members Are Not Disinterested as They Face a Substantial Likelihood of Liability**

91.     Defendants Ingram, Virtue, and McCarthy were members of the Audit Committee at the time the Company lacked proper internal controls and the improper statements detailed

herein were issued. Pursuant to the Audit Committee's Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's financial reports, the Company's business and financial risk management practices, the Company's legal and regulatory compliance, and the integrity of the Company's financial statements and internal controls. Notably, in performing these duties, defendants Ingram, Virtue, and McCarthy were required to discuss with management and the Company's independent auditor the annual financial statements, including the disclosures in management's discussion and analysis. Defendants Ingram, Virtue, and McCarthy were required to discuss with management and the Company's independent auditor all SEC filings before they were filed. Defendants Ingram, Virtue, and McCarthy breached their fiduciary duties by allowing the Company to make the improper statements discussed above. Defendants Ingram, Virtue, and McCarthy each face a substantial likelihood of liability for their breaches of fiduciary duties, and, therefore, any demand upon them is futile.

**Defendant LaPenta and Non-Defendant Basil Are Not Independent or Disinterested**

92. Defendant LaPenta is not disinterested and is incapable of considering a demand to commence and vigorously prosecute this action because he faces a substantial likelihood of liability as he is named as a defendant in the Securities Class Actions.

93. Additionally, the Company concedes in the 2018 Proxy that defendant LaPenta is not independent. First, as CEO of the Company, LaPenta is not independent. Second, LaPenta is not independent because he holds a substantial personal investment in the Company's common stock through RVL and Aston, the Company's principal stockholder, of which he and Basil are members. In particular, LaPenta is a member and CEO of RVL and Aston and Basil is a partner in both RVL and Aston.

94.     Defendant LaPenta and non-defendant Basil lack independence because of their personal entwinement with the Company, as demonstrated by the numerous related-party transactions the Company has entered into with LaPenta, Basil, RVL, and/or its managing member Aston, per the 2018 Proxy:

**Mr. Robert V. LaPenta**

Pursuant to an agreement dated January 29, 2018, we sold 850,000 shares of our common stock to Robert V. LaPenta for $3.60 per share, with total proceeds to the Company of $3,060,000.  The shares of common stock were sold to Mr. LaPenta in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act").  Mr. LaPenta is an accredited investor.

On January 26, 2017, we entered into an amended Revolving Credit Facility, and Mr. LaPenta guaranteed $10.0 million of borrowings under our amended Revolving Credit Facility, increasing our borrowing base by that amount.  In this connection, the Company and its subsidiaries formalized a reimbursement agreement under which the Company and its subsidiaries promise to reimburse Mr. LaPenta in the event any amounts are paid by him under such guaranty, plus interest at a market rate determined at the time of such payment.

In connection with the acquisition of TNT Energy, LLC ("TNT") in May 2016, we issued $2.0 million in promissory notes bearing interest at 5% per annum, of which $1.0 million was due on April 21, 2017 and $1.0 million was due on November 6, 2017.  Mr. LaPenta provided irrevocable letters of credit to support $1.0 million of the TNT acquisition notes.  In February 2017, the maturity date was extended to November 6, 2017 for all of the TNT promissory notes.  Additionally, in February 2017, Mr. LaPenta provided irrevocable letters of credit to support the additional $1.0 million of the TNT promissory notes.   On November 16, 2017, we repaid the TNT acquisition notes.

                              *        *        *

**RVL**

In August 2015, RVL provided an irrevocable letter of credit to support the $10 million Energy Source acquisition notes.  On January 26, 2017, the Energy Source acquisition notes were paid using proceeds from the amended Revolving Credit Facility, and the related guarantee provided by RVL was terminated.

**Aston Capital**

On April 1, 2016, we entered into a $2.6 million amended and restated promissory note with Aston, which bears interest at 9% annually and matures on April 1,

2019, which can be prepaid at our option. In May 2017, we amended the promissory note with Aston to include an additional $9.1 million of borrowings.

In March 2017, Aston provided a $1.5 million advance that bears interest annually at 9%, which is included in "Related party notes payable" in the Consolidated Balance Sheets at December 31, 2017. During 2017, we repaid $0.5 million of the advance. On November 30, 2016, Aston provided a $1.5 million advance that bore interest annually at 9%, which is included in "Related party notes payable" in the Consolidated Balance Sheets at December 31, 2016, and was repaid on January 26, 2017 using proceeds from the amended Revolving Credit Facility.

At December 31, 2017 and 2016, we had accrued interest of $0.1 million and $0.2 million, respectively. During the years ended December 31, 2017, 2016 and 2015, we recorded interest expense related to financing agreements with Aston of $0.8 million, $0.2 million and $0.2 million, respectively.

On January 5, 2017, we ratified a management services agreement with Aston (the "Management Agreement") to memorialize certain management services that Aston has been providing to us since RVL acquired majority control of our voting securities in September 2012. Pursuant to the Management Agreement, Aston provides consulting services in connection with financing matters, budgeting, strategic planning and business development, including, without limitation, assisting us in (i) analyzing the operations and historical performance of target companies; (ii) analyzing and evaluating the transactions with such target companies; (iii) conducting financial, business and operational due diligence, and (iv) evaluating related structuring and other matters. In addition, two of the Aston members hold executive positions in Revolution, and receive no compensation. On May 12, 2016, we granted 250,000 shares of restricted stock to Aston, which vest in three annual installments on May 12, 2017, 2018, and 2019. The Audit Committee of the Board will consider from time to time (at a minimum at such times when the Compensation Committee of the Board evaluates director compensation) whether additional compensation to Aston is appropriate given the nature of the services provided.

Our corporate headquarters utilizes space in Stamford, Connecticut, which is also occupied by affiliates of our Chairman and Chief Executive Officer. Our proportionate share of the space under the underlying lease, which we paid to Aston, was $0.3 million during the year ended December 31, 2017.

Per the Company's May 13, 2019 Form 8-K announcing Basil's appointment:

Mr. Basil previously served on the Company's Board from September 2012 to May 2, 2017. He is a partner at The Boundary Group, a private equity firm focused on the defense and national security sector, and has been a partner of Aston Capital, LLC ("Aston"), a private investment company and the family office of Robert V. LaPenta Sr., since August 2011.

*　　　*　　　*

### Related Person Transactions

Mr. Basil is a partner of RVL 1 LLC ("RVL") and Aston. RVL and its managing member, Aston, together beneficially own approximately 36% of the Company's common stock. Robert V. LaPenta, the Company's Chairman, Chief Executive Officer and President, is a member and Chief Executive Officer of both Aston and RVL. Since the beginning of the Company's 2018 fiscal year, the Company has entered into a number of transactions with Aston in which Mr. Basil may be deemed to have had an indirect material interest as a result of his position as a partner of Aston.

#### Aston Advances and Promissory Notes

Prior to the 2018 fiscal year, Aston had from time to time provided advances and loans to the Company. At January 1, 2018, the Company owed $12.7 million to Aston, including an $11.7 million outstanding promissory note and $1.0 million in outstanding advances.

On May 7, 2018, Aston lent the Company an additional $2.0 million. On May 15, 2018, Aston lent the Company an additional $1.5 million, and on June 15, 2018, Aston lent the Company an additional $2.0 million.

On June 30, 2018, the Company issued Aston a $17.7 million amended promissory note (the "June Note"), reflecting the increased aggregate borrowings at that time, as well as accrued and unpaid interest of $0.5 million. The June Note had a maturity date of July 1, 2020 and bore interest at a 9% annual rate.

On August 3, 2018, the Company agreed, pursuant to an Exchange Agreement dated as of such date (the "Exchange Agreement"), to issue to Aston 1.1 million shares of the Company's common stock in exchange for cancellation of $3.3 million of outstanding principal and interest under the June Note. At Aston's direction, the Company issued 1,000,000 of the shares to Mr. LaPenta and 100,000 shares to James DePalma, the Company's former Chief Financial Officer and an affiliate of Aston.

In connection with the Exchange Agreement transaction, on August 3, 2018 the Company issued a $14.5 million amended and restated promissory to Aston (the "August Note"), reflecting the $3.3 million exchange of amounts owed under the June Note for shares. The August Note was issued with the same terms and conditions as the June Note, except that the maturity date was extended to July 20, 2020. After its issuance, the August Note was the only promissory note outstanding in favor of Aston.

On September 4, 2018, Aston advanced the Company an additional $0.4 million (the "September Advance").

40

On November 21, 2018, the Company entered into a Forbearance Agreement and Fourteenth Amendment to its loan and security agreement (the "Loan Agreement") with Bank of America, N.A. ("Bank of America"). Simultaneously with its entry into the amendment, the Company consolidated all of its outstanding promissory notes and advances due to Mr. LaPenta and Aston and issued a new promissory note, dated as of November 21, 2018, to Mr. LaPenta and Aston (the "Consolidated Note"). The Consolidated Note had an initial aggregate principal amount of $38.4 million, which reflected (i) an advance of $1.0 million from Aston in March 2017 (the "March Advance"), (ii) $14.5 million in principal owed to Aston under the August Note, (iii) the September Advance, (iv) $10.5 million in principal owed to Mr. LaPenta under two promissory notes issued to Mr. LaPenta in November 2018 (the "November Notes"), and (v) $12.0 million owed by the Company to Mr. LaPenta in respect of a guaranty exchange on November 21, 2018. In addition, approximately $0.1 million of accrued and unpaid interest on the March Advance, the August Note, the September Advance, and the November Notes was included in the Consolidated Note. The Consolidated Note incurs interest at the greater of (i) LIBOR plus 3.75% and (ii) 1% above the rate in effect at any time under the Loan Agreement. The Consolidated Note is scheduled to mature on July 20, 2020.

The Consolidated Note is secured by a lien on the Company's and its subsidiaries' assets in favor of Aston, as agent for Aston and Mr. LaPenta, pursuant to a Security Agreement (the "Security Agreement") entered into by the Company and its subsidiaries on November 21, 2018. In connection with the issuance of the Consolidated Note, the Company's guarantor subsidiaries under the Loan Agreement guaranteed the Company's obligations under the Consolidated Note by issuing a Guaranty (the "Guaranty") in favor of Mr. LaPenta and Aston.

Also, in connection with the issuance of the Consolidated Note, Mr. LaPenta and Aston entered into a Subordination and Intercreditor Agreement (the "Subordination Agreement") with Bank of America, the Company and its direct and indirect subsidiaries. Pursuant to the Subordination Agreement, Aston's liens securing the Company's indebtedness under the Consolidated Note are subordinated in all material respects to the liens securing the Company's indebtedness to Bank of America under the Loan Agreement.

During the three months ended March 31, 2019 and the fiscal year ended December 31, 2018, the Company recorded interest expense related to the forgoing financing arrangements with Aston of $0.9 million and $1.6 million, respectively. As of March 31, 2019, there was $46.8 million in aggregate principal and interest outstanding under the Consolidated Note.

The foregoing descriptions of the Consolidated Note, the Security Agreement, the Guaranty and the Subordination Agreement are not complete and are qualified in their entirety by reference to the full text of the agreements, which are attached as Exhibits 99.3, 99.2, 99.4 and 99.5, respectively, to the Company's Form 8-K filed on November 26, 2018.

*Other Arrangements*

The Company is party to an Amended Management Services Agreement, dated as of January 5, 2017, with Aston (the "Management Agreement"). Pursuant to the Management Agreement, Aston provides consulting services in connection with financing matters, budgeting, strategic planning and business development, including, without limitation, assisting the Company in (i) analyzing the operations and historical performance of target companies; (ii) analyzing and evaluating the transactions with such target companies; (iii) conducting financial, business and operational due diligence, and (iv) evaluating related structuring and other matters. As compensation for Aston's services, on May 12, 2016 the Company granted 250,000 shares of restricted stock to Aston, which vested in three annual installments on May 12, 2017, 2018, and 2019. The foregoing description of the Management Agreement is not complete and is qualified in its entirety by reference to the full text of the agreement, which is attached as Exhibit 10.3 to the Company's Annual Report on Form 10-K filed on March 9, 2017.

The Company's corporate headquarters utilizes over 90% of the space in a building in Stamford, Connecticut leased by an affiliate of Mr. LaPenta, the remainder of which is occupied by affiliates of Mr. LaPenta and Aston. The cost of the Company's proportionate share of the space under the underlying lease was $0.2 million and $0.4 million during the three months ended March 31, 2019 and the fiscal year ended December 31, 2018, respectively

95. Furthermore, all of the above related-party transactions were approved by the Audit Committee, demonstrating that the Audit Committee members, defendants Ingram, Virtue, and McCarthy, lack independence from LaPenta and Basil and are unable to commence and vigorously prosecute an action against them.

**Defendants Ingram, Virtue, and McCarthy as Audit Committee Members Are Unable to Consider a Demand Against LaPenta**

96. As discussed above, the Audit Committee has approved numerous loans of monies from LaPenta to the Company. The Audit Committee's acquiescence and/or approval of these loans that involve co-mingling of monies between LaPenta and the Company and raise a reasonable doubt as to LaPenta's domination and control over the Audit Committee, Board, and/or the Company. The numerous loans the Company has received demonstrate that LaPenta is essentially financially supporting the Company and that without these loans the Company may

not be financially viable. Consequently, the multiple loans illustrate that Revolution Lighting and the Board are in LaPenta's debt and therefore raise a reasonable doubt as to whether the Board and/or the Audit Committee would commence and vigorously prosecute an action against LaPenta.

## COUNT I

### Breach of Fiduciary Duty
### (Against the Individual Defendants)

97. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

98. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

99. The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by knowingly causing and/or recklessly allowing the Company to make false and misleading statements and/or fail to disclose that: (i) Revolution Lighting was improperly recognizing revenue for certain transactions; (ii) as a result, Revolution Lighting's financial statements were misstated; (iii) Revolution Lighting lacked adequate internal controls over financial reporting; (iv) as a result, Revolution Lighting would be subject to regulatory scrutiny and incur substantial costs; and (v) as a result of the foregoing, the Individual Defendants' positive statements about Revolution Lighting's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

100. Moreover, the Individual Defendants willfully ignored the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

101. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Revolution Lighting has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

102. Plaintiffs, on behalf of Revolution Lighting, have no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Declaring that Plaintiffs may maintain this derivative action on behalf of the Company and that Plaintiffs are adequate representatives of the Company;

B. Finding the Individual Defendants liable for breaching their fiduciary duties owed to the Company;

C. Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

D. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

*/s/ Steven M. Frederick*
Steven M. Frederick (Ct. 08743)
  sfrederick@wrkk.com

Zachary J. Phillipps (Ct. 30047)
  zphillipps@wrkk.com
Wofsey, Rosen Kweskin & Kuriansky, LLP
600 Summer Street
Stamford, Connecticut 06901
Telephone:      (203) 327-2300
Facsimile:      (203) 967-9273 (Fax)

*Liaison Counsel for Plaintiffs*

**BRAGAR EAGEL & SQUIRE, P.C.**
Marion C. Passmore
  passmore@bespc.com
Melissa A. Fortunato
  fortunato@bespc.com
Todd H. Henderson
  henderson@bespc.com
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:      (212) 308-5858
Facsimile:      (212) 214-0506

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
  mhynes@hh-lawfirm.com
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone:      (484) 875-3116
Facsimile:      (914) 752-3041

*Counsel for Plaintiffs*

**VERIFICATION**

I, DALE BARTON, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

May __29__, 2019

Dale W. Barton (May 29, 2019)

Dale Barton

**VERIFICATION**

I, ROBERT FLOS, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

May __29__, 2019

*Robert Flos*
_____
Robert Flos

**VERIFICATION**

I, GIOVANNI VECCHIATO, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

May ____ 31 ____, 2019

*Giovanni Vecchiato*
Giovanni Vecchiato (May 31, 2019)

Giovanni Vecchiato